*697 Justice Kagan
delivered the opinion of the Court.
Almost a decade ago, a state child protective services worker and a county deputy sheriff interviewed a girl at her elementary school in Oregon about allegations that her father had sexually abused her. The girl’s mother subsequently sued the government officials on the child’s behalf for damages under Rev. Stat. § 1979,42 U. S. C. § 1983, claiming that the interview infringed the Fourth Amendment. The United States Court of Appeals for the Ninth Circuit agreed, ruling that the officials had violated the Constitution *698 by failing to obtain a warrant to conduct the interview. But the Court of Appeals further held that qualified immunity shielded the officials from monetary liability because the constitutional right at issue was not clearly established under existing law.
The two officials sought this Court’s review of the Ninth Circuit’s ruling on the Fourth Amendment. We granted their petitions to examine two questions. First, may government officials who prevail on grounds of qualified immunity obtain our review of a court of appeals’ decision that their conduct violated the Constitution? And second, if we may consider cases in this procedural posture, did the Ninth Circuit correctly determine that this interview breached the Fourth Amendment?
We conclude that this Court generally may review a lower court’s constitutional ruling at the behest of a government official granted immunity. But we may not do so in this case for reasons peculiar to it. The case has become moot because the child has grown up and moved across the country, and so will never again be subject to the Oregon in-school interviewing practices whose constitutionality is at issue. We therefore do not reach the Fourth Amendment question in this case. In line with our normal practice when mootness frustrates a party’s right to appeal, see United States v. Munsingwear, Inc., 340 U.S. 36, 39 (1950), we vacate the part of the Ninth Circuit’s opinion that decided the Fourth Amendment issue.
I
In February 2003, police arrested Nimrod Greene for suspected sexual abuse of a young boy unrelated to him. During the investigation of that offense, the boy’s parents told police that they suspected Greene of molesting his 9-year-old daughter S. G. The police reported this information to the Oregon Department of Human Services, which assigned petitioner Bob Camreta, a child protective services caseworker, to assess S. G.’s safety. Several days later, Camreta, accom *699 panied by petitioner James Alford, a Deschutes County deputy sheriff, went to S. G.’s elementary school and interviewed her about the allegations. Camreta and Alford did not have a warrant, nor had they obtained parental consent to conduct the interview. Although S. G. at first denied that her father had molested her, she eventually stated that she had been abused. Greene was indicted and stood trial for sexually abusing S. G., but the jury failed to reach a verdict and the charges were later dismissed.
Respondent Sarah Greene, S. G.’s mother, subsequently sued Camreta and Alford on S. G.’s behalf[1] for damages under 42 U. S. C. § 1983, which authorizes suits against state officials for violations of constitutional rights. S. G. alleged that the officials’ in-school interview had breached the Fourth Amendment’s proscription on unreasonable seizures.[2]
The District Court granted summary judgment to Camreta and Alford, and the Ninth Circuit affirmed. The Court of Appeals first ruled that the interview violated S. G.’s rights because Camreta and Alford had “seize[d] and interrogate[d] S. G. in the absence of a warrant, a court order, exigent circumstances, or parental consent.” 588 F. 3d 1011, 1030 (2009) (footnote omitted). But the court further held that the officials were entitled to qualified immunity from damages liability because no clearly established law had warned them of the illegality of their conduct. Id., at 1031-1033.
The Ninth Circuit explained why it had ehosen to rule on the merits of the constitutional claim, rather than merely hold that the officials were immune from suit. By addressing the legality of the interview, the court said, it could “pro *700 vide guidance to those charged with the difficult task of protecting child welfare within the confines of the Fourth Amendment.” Id., at 1022. That guidance came in no uncertain terms: “[G]overnment officials investigating allegations of child abuse,” the court warned, “should cease operating on the assumption that a ‘special need’ automatically justifies dispensing with traditional Fourth Amendment protections in this context.” Id., at 1033.
Although the judgment entered was in their favor, Camreta and Alford petitioned this Court to review the Ninth Circuit’s ruling that their conduct violated the Fourth Amendment. S. G. declined to cross-petition for review of the decision that the officials have immunity. We granted certiorari. 562 U. S. 960 (2010).
II
We first consider our ability to act on a petition brought by government officials who have won final judgment on grounds of qualified immunity, but who object to an appellate court’s ruling that they violated the plaintiff’s constitutional rights. Camreta and Alford are, without doubt, prevailing parties. The Ninth Circuit’s decision shielded them from monetary liability, and S. G. chose not to contest that ruling. So whatever else follows, they will not have to pay S. G. the damages she sought. The question we confront is whether we may nonetheless review the Court of Appeals’ holding that the officials violated the Constitution.
The statute governing this Court’s jurisdiction authorizes us to adjudicate a case in this posture, and S. G. does not contend otherwise. The relevant provision confers unqualified power on this Court to grant certiorari “upon the petition of any party.” 28 U. S. C. § 1254(1) (emphasis added). That language covers petitions brought by litigants who have prevailed, as well as those who have lost, in the court below. See E. Gressman, K. Geller, S. Shapiro, T. Bishop, & *701 E. Hartnett, Supreme Court Practice 87 (9th ed. 2007) (hereinafter Stern & Gressman).
S. G., however, alleges two impediments to our exercise of statutory authority here, one constitutional and the other prudential. First, she claims that Article III bars review because petitions submitted by immunized officials present no case or controversy. See Brief for Respondent 31-39. Second, she argues that our settled practice of declining to hear appeals by prevailing parties should apply with full force when officials have obtained immunity. ’ See id., at 24-27. We disagree on both counts.
A
Article III of the Constitution grants this Court authority to adjudicate legal disputes only in the context of “Cases” or “Controversies.” To enforce this limitation, we demand that litigants demonstrate a “personal stake” in the suit. Summers v. Earth Island Institute, 555 U. S. 488, 493 (2009) (internal quotation marks omitted); see also United States Parole Comm’n v. Geraghty, 445 U. S. 388, 395-397 (1980). The party invoking the Court’s authority has such a stake when three conditions are satisfied: The petitioner must show that he has “suffered an injury in fact” that is caused by “the conduct complained of” and that “will be redressed by a favorable decision.” Lujan v. Defenders of Wildlife, 504 U. S. 555, 560-561 (1992) (internal quotation marks omitted). And the opposing party also must have an ongoing interest in the dispute, so that the case features “that concrete adverseness which sharpens the presentation of issues.” Los Angeles v. Lyons, 461 U. S. 95, 101 (1983) (internal quotation marks omitted). To ensure a case remains “fit for federal-court adjudication,” the parties must have the necessary stake not only at the outset of litigation, but throughout its course. Arizonans for Official English v. Arizona, 520 U. S. 43, 67 (1997).
*702 We have previously recognized that an appeal brought by a prevailing party may satisfy Article Ill’s case-or-controversy requirement. See Deposit Guaranty Nat. Bank v. Roper, 445 U. S. 326, 332-336 (1980). Indeed, we have twice before allowed a party for whom judgment was entered to challenge an unfavorable lower court ruling. See ibid.; Electrical Fittings Corp. v. Thomas & Betts Co., 307 U. S. 241 (1939).[3] In that context as in others, we stated, the critical question under Article III is whether the litigant retains the necessary personal stake in the appeal. Deposit Guaranty, 445 U. S., at 334. As we will explain, a court will usually invoke rules of “federal appellate practice” to decline review of a prevailing party's challenge even when he has the requisite stake. Id., at 333; see infra, at 703-704. But in such a case, Article III is not what poses the bar; these rules of practice “d[o] not have [their] source in the jurisdictional limitations” of the Constitution. Deposit Guaranty, 445 U. S., at 333-334. So long as the litigants possess the personal stake discussed above, an appeal presents a case or controversy, no matter that the appealing party was the prevailing party below.
This Article III standard often will be met when immunized officials seek to challenge a ruling that their conduct violated the Constitution. That is not because a court has made a retrospective judgment about the lawfulness of the officials' behavior, for that judgment is unaccompanied by any personal liability. Rather, it is because the judgment may have prospective effect on the parties. The court in such a case says: “Although this official is immune from dam *703 ages today, what he did violates the Constitution and he or anyone else who does that thing again will be personally hable.” If the official regularly engages in that conduct as part of his job (as Camreta does), he suffers injury caused by the adverse constitutional ruling. So long as it continues in effect, he must either change the way he performs his duties or risk a meritorious damages action. Cf. id., at 337-338 (discussing prevailing party’s stake in a ruling’s prospective effects). Only by overturning the ruling on appeal can the official gain clearance to engage in the conduct in the future. He thus can demonstrate, as we demand, injury, causation, and redressability.[4] And conversely, if the person who initially brought the suit may again be subject to the challenged conduct, she has a stake in preserving the court’s holding. See Erie v. Pap’s A. M., 529 U. S. 277, 287-289 (2000); Honig v. Doe, 484 U. S. 305, 318-323 (1988); cf. Lyons, 461 U. S., at 111 (examining whether the plaintiff had shown “a sufficient likelihood that he will again be wronged in a similar way”). Only if the ruling remains good law will she have ongoing protection from the practice.
We therefore reject S. G.’s view that Article III bars us from adjudicating any and all challenges brought by government officials who have received immunity below. That the victor has filed the appeal does not deprive us of jurisdiction. The parties in such eases may yet have a sufficient “interest in the outcome of [a litigated] issue” to present a case or controversy. Deposit Guaranty, 445 U. S., at 336, n. 7.
B
Article III aside, an important question of judicial policy remains. As a matter of practice and prudence, we have generally declined to consider cases at the request of a pre *704 vailing party, even when the Constitution allowed us to do so. See, e. g., Gunn v. University Comm. to End War in Viet Nam, 399 U. S. 383, 390, n. 5 (1970); New York Telephone Co. v. Maltbie, 291 U. S. 645, 646 (1934) (per curiam); see also Bunting v. Mellen, 541 U. S. 1019, 1023 (2004) (Scalia, J., dissenting from denial of certiorari) (“[0]ur practice reflects a ‘settled refusal’ to entertain an appeal by a party on an issue as to which he prevailed” (quoting Stern & Gressman 79 (8th ed. 2002))). Our resources are not well spent superintending each word a lower court utters en route to a final judgment in the petitioning party’s favor. See California v. Rooney, 483 U. S. 307, 311 (1987) (per curiam) (“[Tjhat the Court of Appeal reached its decision through analysis different than this Court might have used does not make it appropriate ... for the prevailing party to request us to review it”). We therefore have adhered with some rigor to the principle that “[tjhis Court reviews judgments, not statements in opinions.” Ibid, (internal quotation marks omitted). On the few occasions when we have departed from that principle, we have pointed to a “policy reaso[n] ... of sufficient importance to allow an appeal” by the winner below. Deposit Guaranty, 445 U. S., at 336, n. 7.
We think just such a reason places qualified immunity eases in a special category when it comes to this Court’s review of appeals brought by winners. The constitutional determinations that prevailing parties ask us to consider in these cases are not mere dicta or “statements in opinions.” Rooney, 483 U. S., at 311 (internal quotation marks omitted); see Bunting, 541 U. S., at 1023 (Scalia, J., dissenting from denial of certiorari) (stating that such a determination is “not mere dictum in the ordinary sense”). They are rulings that have a significant future effect on the conduct of public officials — both the prevailing parties and their co-workers — and the policies of the government units to which they belong. See supra, at 702-703. And more: they are rulings self-consciously designed to produce this effect, by establishing *705 controlling law and preventing invocations of immunity in later cases. And still more: they are rulings designed this way with this Court’s permission, to promote clarity — and observance — of constitutional rules. We describe in more detail below these features of the qualified immunity world and why they came to be. We hold that taken together, they support bending our usual rule to permit consideration of immunized officials’ petitions.
To begin, then, with the nature of these suits: Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not “unduly inhibit officials in the discharge of their duties,” Anderson v. Creighton, 483 U. S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a “clearly established” right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U. S. 800, 818 (1982). That means a court can often avoid ruling on the plaintiff’s claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff’s claim, even though novel or otherwise unsettled, in fact has merit.
And indeed, our usual adjudicatory rules suggest that a court should forbear resolving this issue. After all, a “longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.” Lyng v. Northwest Indian Cemetery Protective Assn., 485 U. S. 439, 445 (1988); see also Ashwander v. TVA, 297 U. S. 288, 346-347 (1936) (Brandéis, J., concurring). In this category of qualified immunity cases, a court can enter judgment without ever ruling on the (perhaps difficult) constitutional claim the plaintiff has raised. *706 Small wonder, then, that a court might leave that issue for another day.
But we have long recognized that this day may never come — that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo. County of Sacramento v. Lewis, 523 U. S. 833, 841, n. 5 (1998). Consider a plausible but unsettled constitutional claim asserted against a government official in a suit for money damages. The court does not resolve the claim because the official has immunity. He thus persists in the challenged practice; he knows that he can avoid liability in any future damages action, because the law has still not been clearly established. Another plaintiff brings suit, and another court both awards immunity and bypasses the claim. And again, and again, and again. So the moment of decision does not arrive.[5] Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements. See, e. g., ibid,.; Wilson v. Layne, 526 U. S. 603, 609 (1999). Qualified immunity thus may frustrate “the development of constitutional precedent” and the promotion of law-abiding behavior. Pearson v. Callahan, 555 U. S. 223, 237 (2009).
For this reason, we have permitted lower courts to avoid avoidance — that is, to determine whether a right exists before examining whether it was clearly established. See, e. g., ibid.; Lewis, 523 U. S., at 841, n. 5. Indeed, for some *707 time we required courts considering qualified immunity claims to first address the constitutional question, so as to promote “the law's elaboration from case to case.” Saucier v. Katz, 533 U. S. 194, 201 (2001). More recently, we have left this matter to the discretion of lower courts, and indeed detailed a range of circumstances in which courts should address only the immunity question. See Pearson, 555 U. S., at 236-242. In general, courts should think hard, and then think hard again, before turning small eases into large ones. But it remains true that following the two-step sequence— defining constitutional rights and only then conferring immunity — is sometimes beneficial to clarify the legal standards governing public officials. Id., at 236; see id., at 236-242 (discussing factors courts should consider in making this determination).
Here, the Court of Appeals followed exactly this two-step process, for exactly the reasons we have said may in select circumstances make it “advantageous.” Id., at 242. The court, as noted earlier, explained that it was “addressing] both prongs of the qualified immunity inquiry ... to provide guidance to those charged with the difficult task of protecting child welfare within the confines of the Fourth Amendment.” 588 F. 3d, at 1022. To that end, the court adopted constitutional standards to govern all in-school interviews of suspected child abuse victims. See id., at 1030. And the court specifically instructed government officials to follow those standards going forward — to “cease operating on the assumption” that warrantless interviews are permitted. See id., at 1033. With the law thus clearly established, officials who conduct this kind of interview will not receive immunity in the Ninth Circuit. And the State of Oregon has done just what we would expect in the wake of the court's decision: It has provided revised legal advice, consonant with the Ninth Circuit’s ruling, to child protective services workers wishing to interview children in schools. See Tr. of Oral Arg. 14. The court thus accomplished what it set out to do: *708 settle a question of constitutional law and thereby guide the conduct of officials.
Given its purpose and effect, such a decision is reviewable in this Court at the behest of an immunized official. No mere dictum, a constitutional ruling preparatory to a grant of immunity creates law that governs the official’s behavior. If our usual rule pertaining to prevailing parties applied, the official would “fac[e] an unenviable choice”: He must either acquiesce in a ruling he had no opportunity to contest in this Court, or “defy the views of the lower court, adhere to practices that have been declared illegal, and thus invite new suits and potential punitive damages.” Pearson, 555 U. S., at 240-241 (internal quotation marks and brackets omitted). And if our usual bar on review applied, it would undermine the very purpose served by the two-step process, “which is to clarify constitutional rights without undue delay.” Bunting, 541 U. S., at 1024 (Scalia, J., dissenting from denial of certiorari). This Court, needless to say, also plays a role in clarifying rights. Just as that purpose may justify an appellate court in reaching beyond an immunity defense to decide a constitutional issue, so too that purpose may support this Court in reviewing the correctness of the lower court’s decision.[6]
We emphasize, however, two limits of today’s holding. First, it addresses only our own authority to review cases in this procedural posture. The Ninth Circuit had no occasion to consider whether it could hear an appeal from an immu *709 nized official: In that court, after all, S. G. appealed the judgment in the officials’ favor. We therefore need not and do not decide if an appellate court, too, can entertain an appeal from a party who has prevailed on immunity grounds.[7] Second, our holding concerns only what this Court may review; what we actually will choose to review is a different matter. That choice will be governed by the ordinary principles informing our decision whether to grant certiorari—a “power [we] . . . sparingly exereis[e].” Forsyth v. Hammond, 166 U. S. 506, 514 (1897); see also id., at 514-515 (this Court grants review “only when the circumstances of the case satisfy us that the importance of the question involved, the necessity of avoiding conflict [in the lower courts], or some matter affecting the interests of this nation . . . demands such exercise”); this Court’s Rule 10. Our decision today does no more than exempt one special category of cases from our usual rule against considering prevailing parties’ petitions. Going forward, we will consider these petitions one by one in accord with our usual standards.
Ill
Although we reject S. G.’s arguments for dismissing this case at the threshold, we find that a separate jurisdictional *710 problem requires that result: This case, we conclude, is moot.[8]
As we explained above, supra, at 702-703, in a dispute of this kind, both the plaintiff and the defendant ordinarily retain a stake in the outcome. That is true of one defendant here: Camreta remains employed as a child protective services worker, so he has an interest in challenging the Ninth Circuit’s ruling requiring him to obtain a warrant before conducting an in-school interview.[9] But S. G. can no longer claim the plaintiff’s usual stake in preserving the court’s *711 holding because she is no longer in need of any protection from the challenged practice. After we granted certiorari, we discovered that S. G. has “moved to Florida, and ha[s] no intention of relocating back to Oregon.” Brief for Respondent 13, n. 13. What is more, S. G. is now only months away from her 18th birthday — and, presumably, from her high school graduation. See id., at 31. S. G. therefore cannot be affected by the Court of Appeals' ruling; she faces not the slightest possibility of being seized in a school in the Ninth Circuit's jurisdiction as part of a child abuse investigation. When “subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,” we have no live controversy to review. United States v. Concentrated Phosphate Export Assn., Inc., 393 U. S. 199, 203 (1968); see, e. g., Atherton Mills v. Johnston, 259 U. S. 13, 15-16 (1922) (suit contesting the validity of a child labor statute mooted when plaintiff-child was “[no longer] within the ages affected by the act”); DeFunis v. Odegaard, 416 U. S. 312 (1974) (per curiam) (suit challenging law school admissions policy mooted when plaintiff neared graduation). Time and distance combined have stymied our ability to consider this petition.
Camreta makes only one counterargument: He avers that S. G. has a continuing interest in the Ninth Circuit's constitutional ruling because it may help her establish a municipal liability claim against Deschutes County. See Tr. of Oral Arg. 7; id., at 8. S. G.’s initial complaint charged that the county has an official policy of unconstitutionally subjecting schoolchildren to police interrogation. See n. 2, supra. Finding no evidence of such a policy (even assuming that an unlawful seizure had occurred in this case), the District Court granted summary judgment to the county, App. to Pet. for Cert, in No. 09-1454, pp. 66-67, and S. G. did not appeal that ruling, 588 F. 3d, at 1020, n. 4. And although S. G. recently sought to reinstate her claim against the county, the District Court denied that motion. 6:05-cv-06047-AA, *712 Docket Entry No. 139 (D Ore., Jan. 4, 2011). Whatever interest S. G. might have were her municipal liability claim still pending (an issue we need not and do not decide), we do not think S. G.'s dismissed claim against a different defendant involving a separate legal theory can save this case from mootness. See Commodity Futures Trading Comm’n v. Board of Trade of Chicago, 701 F. 2d 653, 656 (CA7 1983) (Posner, J.) (“[O]ne can never be certain that findings made in a decision concluding one lawsuit will not some day . . . control the outcome of another suit. But if that were enough to avoid mootness, no case would ever be moot”).
We thus must decide how to dispose of this case. When a civil suit becomes moot pending appeal, we have the authority to “direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.” 28 U. S. C. § 2106. Our “established” (though not exceptionless) practice in this situation is to vacate the judgment below. See Munsingwear, 340 U. S., at 39; Alvarez v. Smith, 558 U. S. 87, 94 (2009). “A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance,” we have emphasized, “ought not in fairness be forced to acquiesce in” that ruling. U S. Bancorp Mortgage Co. v. Bonner Mall Partnership, 513 U. S. 18, 25 (1994). The equitable remedy of vacatur ensures that “those who have been prevented from obtaining the review to which they are entitled [are] not. . . treated as if there had been a review.” Munsingwear, 340 U. S., at 39.[10]
*713 S. G. contends that vacatur is inappropriate in the qualified immunity context because that disposition would “undermine” the Court of Appeals’ choice to “decide [a] constitutional questio[n]” to govern future cases. Brief for Respondent 41-42; Tr. of Oral Arg. 47. Far from counseling against vacatur, S. G.’s argument reveals the necessity of that procedural course. The point of vacatur is to prevent an unreviewable decision “from spawning any legal consequences,” so that no party is harmed by what we have called a “preliminary” adjudication. Munsingwear, 340 U. S., at 40-41. As we have just explained, a constitutional ruling in a qualified immunity case is a legally consequential decision; that is the very reason we think it appropriate for review even at the behest of a prevailing party. See supra, at 704-708. When happenstance prevents that review from occurring, the normal rule should apply: Vacatur then rightly “strips the decision below of its binding effect,” Deakins v. Monaghan, 484 U. S. 193, 200 (1988), and “clears the path for future relitigation,” Munsingwear, 340 U. S., at 40.
In this case, the happenstance of S. G.’s moving across country and becoming an adult has deprived Camreta of his appeal rights. Mootness has frustrated his ability to challenge the Court of Appeals’ ruling that he must obtain a warrant before interviewing a suspected child abuse victim *714 at school. We therefore vacate the part of the Ninth Circuit’s opinion that addressed that issue, and remand for further proceedings consistent with this opinion.[11] See, e. g., Arove v. Hoffman, 552 U. S. 117, 118-119 (2008) (per curiam); Selig v. Pediatric Specialty Care, Inc., 551 U. S. 1142 (2007).

It is so ordered.

 Because Greene filed suit as next friend for her minor daughter, we will refer to respondent as S. G. throughout this opinion.

 S. G. also sued Deschutes County, alleging that it has a policy of unconstitutionally seizing children in public schools. See 588 F. 3d 1011, 1020, n. 4 (CA9 2009). The District Court rejected this claim, and S. G. did not appeal that ruling to the Ninth Circuit. Ibid.

 The dissent diseusses Deposit Guaranty and Electrical Fittings at length in an effort to distinguish them from this suit. See post, at 718-722 (opinion of Kennedy, X). But we do not say those cases are foursquare with this one on their facts; we rely on them only for the proposition that this Court has previously identified no special Article III bar on review of appeals brought by parties who obtained a judgment in their favor below. The dissent does not, because it cannot, dispute that simple point.

 Contrary to the dissent’s view, see post, at 726, the injury to the official thus occurs independent of any future suit brought by a third party. Indeed, no such suit is likely to arise because the prospect of damages liability will force the official to ehange his conduct.

 The constitutional issue could arise in a case in which qualified immunity is unavailable — for example, “in a suit to enjoin future conduct, in an action against a municipality, or in litigating a suppression motion in a criminal proceeding.” Lewis, 523 U. S., at 841, n. 5. A decision in such a case would break the repetitive cycle of qualified immunity defenses described above. But some kinds of constitutional questions do not often come up in these alternative settings. Pearson v. Callahan, 555 U. S. 223, 236 (2009); see Lewis, 523 U. S., at 841, n. 5 (noting that “these avenues w[ill] not necessarily be open”).

 The dissent complains that our decision “allows plaintiffs to obtain binding constitutional determinations on the merits that lie beyond this Court’s jurisdiction to review.” Post, at 725. But that is not the case. It is not this decision but our prior precedents that allow lower courts to issue “binding constitutional determinations” in qualified immunity cases even when the plaintiff is not entitled to money damages. And it is not our decision but the dissent that would insulate these rulings from this Court’s power to review.

 We note, however, that the considerations persuading us to permit review of petitions in this posture may not have the same force as applied to a district court decision. “A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.” 18 J. Moore et al., Moore’s Federal Practice § 134.02[l][d], p. 134-26 (3d ed. 2011). Many Courts of Appeals therefore decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity. See, e. g., Kalka v. Hawk, 215 F. 3d 90,100 (CADC 2000) (Tatel, J., concurring in part and concurring in judgment) (collecting cases). Otherwise said, district court decisions— unlike those from the courts of appeals — do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.

 Justice Sotomayor maintains that, because this case is moot, “[t]here is no warrant for reaching th[e] question” whether immunized officials may obtain our consideration of an adverse constitutional ruling. Post, at 715 (opinion concurring in judgment). But this Court has never held that it may consider only one threshold issue per case. And here, as we will explain, infra, at 712-714, and n. 10, our discussion of reviewability is critical to our ultimate disposition of this suit. Moreover, that issue was fully litigated in this Court. We granted certiorari to consider whether “the Ninth Circuit’s constitutional ruling [is] reviewable, notwithstanding that [the Court of Appeals] ruled in [the officials’] favor on qualified immunity grounds.” Pet. for Cert, in No. 09-1454, p. i. And all the parties, as well as the United States as amicus curiae, addressed that question in their briefs and oral arguments. Compare Brief for Petitioner in No. 09-1454, pp. 41-44, Brief for Petitioner in No. 09-1478, p. 4, n. 1, Reply Brief for Petitioner in No. 09-1454, pp. 3-13, Reply Brief for Petitioner in No. 09-1478, pp. 5-6, Brief for United States as Amicus Curiae 11-20, and Tr. of Oral Arg. 4-14, 17-24, 54-58, with Brief for Respondent 24-42 and Tr. of Oral Arg. 27-31, 46-52.

 The same cannot be said for Deputy Sheriff Alford. In their briefs, the parties informed us that Alford no longer works for Deschutes County or in law enforcement. See Brief for Respondent 1, n. 2; Reply Brief for Petitioner in No. 09-1478. Because Alford will not again participate in a child abuse investigation, he has lost his interest in the Fourth Amendment ruling. See supra, at 702-703; cf. Arizonans for Official English v. Arizona, 520 U. S. 43,67 (1997) (holding that the plaintiff’s challenge to a state law affecting the performance of her job duties was mooted when she left state employment). But in light of Camreta’s continuing stake, Alford’s altered circumstances are immaterial to our resolution of this dispute, and we do not decide any questions that would arise if he were the only defendant.

 Our analysis of the proper disposition of this case follows from our conclusion that government officials who secure a favorable judgment on immunity grounds may obtain our review of an adverse constitutional holding. See supra, at 708. As just noted, Munsingwear justified vacatur to protect a litigant who had the right to appeal but lost that opportunity due to happenstance. 340 U. S., at 39, 41. We have therefore left lower court decisions intact when mootness did not deprive the appealing party of any review to which he was entitled. See, e. g., U. S. Bancorp Mortgage Co., 513 U. S., at 25 (holding that the appealing party had “sur *713 rendered] his claim to the equitable remedy of vacatur” by settling the case and thus “voluntarily forfeiting] his legal remedy by the ordinary processes of appeal”); Karcher v. May, 484 U. S. 72, 83 (1987) (holding that vacatur in light of mootness was not warranted when the losing party declined to file an appeal). So if immunized officials could not challenge an appellate decision in this Court, we would choose not to exercise our equitable authority to vacate that decision, even if the case later became moot. But here, as we have just explained, the theory that underlies our prior cases applying Munsingwear is satisfied: Vacatur expunges an adverse decision that would be reviewable had this ease not become moot. See Arizonans, 520 U. S., at 74 (finding vacatur proper because, “when the mooting event occurred,” the Arizona Attorney General was pursuing his “right to present argument on appeal”).

 Our disposition of this case differs slightly from the normal Munsingwear order vacating the lower court’s judgment and remanding the case with instructions to dismiss the relevant claim. We leave untouched the Court of Appeals’ ruling on qualified immunity and its corresponding dismissal of S. G.’s claim because S. G. chose not to challenge that ruling. We vacate the Ninth Circuit’s ruling addressing the merits of the Fourth Amendment issue because, as we have explained, supra, at 707-708, that is the part of the decision that mootness prevents us from reviewing but that has prospective effects on Camreta. See Walling v. James V. Reuter, Inc., 321 U. S. 671, 677 (1944) (observing that when a suit becomes moot, “this Court... may make such disposition of the whole case as justice may require”). But we emphasize that this unique disposition follows from the unique posture of this case and signals no endorsement of deviations from the usual Munsingwear order in other situations.